STATE of Arkansas *v.* Belynda Faye GOFF

CR 01-1051                                                79 S.W.3d 320

Supreme Court of Arkansas
Opinion delivered June 27, 2002

*Mark Pryor*, Att'y Gen., by: *Vada Berger*, Ass't Att'y Gen., for appellant.

*Hatfield & Lassiter*, by: *Jack T. Lassiter*, for appellee.

P ER CURIAM. Appellee was convicted in the Circuit Court of Carroll County of first-degree murder for the death of her husband, Stephen Goff, and sentenced to life imprisonment. This court affirmed the determination of appellee's guilt but reversed her sentence on appeal. *Goff v. State*, 329 Ark. 513, 953 S.W.2d 38 (1997). On remand for resentencing, a second jury sentenced appellee to life imprisonment, and this court affirmed on appeal. *Goff v. State*, 341 Ark. 567, 19 S.W.3d 579 (2000).

Appellee subsequently filed a timely petition for post-conviction relief pursuant to Ark. R. Crim. P. 37. In her petition, appellee claimed that one of her trial attorneys, Charles Davis, rendered ineffective assistance of counsel by preparing an affidavit in support of appellee's application for her husband's life insurance proceeds, which asserted that her husband "appeared to have been severely beaten somewhere in Carroll County and returned home and left in the doorway." According to appellee, Davis should

have known "that there existed no evidence that [Goff] was killed outside the apartment." Appellee further alleged that Davis compounded his ineffectiveness when, after the affidavit was introduced into evidence by the prosecution, he failed to withdraw as counsel and testify in support of appellee's testimony that the language of the affidavit was counsel's creation.

A hearing was held, and at its conclusion, appellee moved to amend her petition to include a claim that Davis was ineffective for failing to adequately proffer the testimony of her brother, Chris Lindley, or to call him to testify. According to the amended petition, Goff had tried to involve Lindley in an arson scheme. It was alleged that a few days before the murder, Lindley refused to participate in the scheme, at which time, Goff expressed fear for his life if he did not do the job. Appellee also alleged that following Goff's death, Lindley received a threatening telephone call, during which the caller stated that Lindley would end up like Goff if he told anyone about the arson scheme. The circuit court allowed the amendment and conducted a second hearing on the petition. The petition was granted, and the State filed a notice of appeal.

■ The Supreme Court enunciated the standard for assessing the effectiveness of counsel in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Thus, a defendant must first show that counsel's performance "fell below an objective standard of reasonableness," *id.* at 688, and sec-

ond, that the errors "actually had an adverse effect on the defense." *Id.* at 693.

■■ Ineffective assistance of counsel cannot be established by a mere showing of error by counsel. *Thomas v. State*, 330 Ark. 442, 448, 954 S.W.2d 255, 258 (1997) (citing *Huls v. State*, 301 Ark. 572, 785 S.W.2d 467 (1990)). In reviewing counsel's performance, we must indulge in a strong presumption that counsel's conduct falls within the range of reasonable professional assistance. *Noel v. State*, 342 Ark. 35, 38, 26 S.W.3d 123, 125 (2000). To rebut this presumption, one must show that there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt respecting guilt in that the decision reached would have been different absent the errors. *Id.* A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. *Id.* In making this determination, we must consider the totality of the evidence before the factfinder, and we will not reverse the denial of postconviction relief unless the lower court's findings are clearly against the preponderance of the evidence. *Id.* Applying these standards, it is clear that the circuit court erred in granting appellee postconviction relief; therefore, the decision must be reversed.

As mentioned, appellee's first claim was that Davis was ineffective for allowing appellee to make certain statements in an insurance affidavit. Appellee testified at the Rule 37 hearing that before she was charged with murder, Davis suggested that she file an application for accidental death benefits, because a jury would consider it suspicious if she did not do so. According to appellee, she filled out the affidavit using language provided by Davis. However, Davis testified that he had nothing to do with the preparation of the affidavit and saw it for the first time at trial. According to Davis, he referred appellee to Jeff Watson, his law partner, to handle her insurance claims, and Watson agreed to do so. A letter was submitted with appellee's application for insurance benefits, signed by Watson. According to Davis, he never spoke to Watson about the affidavit nor did he know whether Watson helped appellee prepare the affidavit.

■ The prosecution questioned appellee about the affidavit and relied on it in closing argument in the guilt phase of the original trial. Appellee claims that Davis was ineffective because the language in the affidavit conflicted with physical evidence suggesting that Goff was killed inside the apartment, and in turn, was used against her. According to appellee, Davis should have withdrawn as counsel and testified at trial that the language was his, not that of the appellee. The language in the affidavit, that Goff was beaten outside of the apartment and returned there, was consistent with appellee's defense of general denial. Davis testified at the Rule 37 hearing that he had no knowledge of the preparation of the affidavit, including whether his co-counsel, Watson, prepared it. Even if it is assumed that Davis was responsible for the language, his determination that the affidavit was not harmful because it was consistent with appellee's version of the crime and thus, need only be addressed by her testimony, was a strategic decision. Matters of trial tactics and strategy are not grounds for a finding of ineffective assistance of counsel. *Lee v. State*, 343 Ark. 702, 715, 38 S.W.3d 334, 343 (2001). Although a strategy may be poor or mistaken, that does not make it deficient for purposes of an ineffective-assistance claim. *Johnson v. State*, 321 Ark. 117, 131, 900 S.W.2d 940, 948 (1995).

■ ■ In addition, appellee failed to prove that either Davis or Watson would have corroborated her testimony concerning the affidavit. As mentioned, Davis testified that he had no knowledge of the preparation of the affidavit; therefore, he would not have corroborated appellee's version at trial. Moreover, appellee did not call Watson to testify at the Rule 37 hearing, despite having the burden of proof on this point. *See Mitchael v. State*, 309 Ark. 151, 157, 828 S.W.2d 351, 355 (1992). Appellee has not proven that either attorney would have corroborated her version of events; therefore, the circuit court erred in granting relief on the basis that either of the attorneys was ineffective for failing to offer such testimony. The circuit court also erred by concluding, alternatively, that Davis was ineffective because he could have amended the affidavit when he learned that it would be used against appellee. However, the court found that Davis never saw the affidavit before trial. And, even if he could have

amended it, this would not have prevented the original affidavit from being used against appellee as well as the amendment, which would have shown that appellee changed her story.

■ Appellee also fails to show how she was prejudiced by Davis's alleged deficient performance. Appellee chooses to ignore the significant amount of evidence presented at trial establishing that Goff was murdered inside the apartment he shared with appellee, which points to appellee as the killer, as she was the only one in the house capable of committing the crime.

At trial, evidence was presented that appellee and Goff had marital problems and that she had been quoted as saying that she would "bash his head in" if she suspected future infidelity. At 1:57 a.m., the morning of the murder, appellee's neighbors heard three knocks on her door followed by it being opened. Minutes later, the neighbors heard banging, as though someone was banging on a wall or on the ceiling. The associate medical examiner opined that the condition of Goff's body at 6:00 a.m. was consistent with his having died at 2:00 a.m. According to appellee, she got up about nine minutes after her alarm went off, perhaps as early as 4:23 a.m., and found her husband's body shortly thereafter; however, the operator reported receiving her call for an ambulance at 4:22 a.m. Upon their arrival, the EMT had to forcibly push the door open in order for appellee and her son to get out of the apartment because Goff's body was on the floor in the corner, leaning against the door. Goff's head was slightly elevated with massive amounts of blood underneath. Blood spatters on the wall behind Goff's head went up to the ceiling and onto the door. The blood splatters indicate that the attacker was right-handed, and appellee is right-handed. Officers noticed brain matter on the floor and skull fragments in other areas of the living room. Except for the areas surrounding Goff's body, nothing in the apartment appeared to be amiss or showed signs of struggle. The apartment windows, the only exits other than the front door, were closed, with their screens on, drapes closed, and potted plants on their sills. There was also blood found on the inside of the door and its doorknob but not on the outside of the door.

The EMT noticed that appellee's hair did not appear "messed up" upon their arrival, and she did not appear groggy or sleepy, although her three-year-old son did appear sleepy. Officers noticed that the bathtub, shower curtain, and toilet plunger were all wet. A drop of blood was found on the rail in the bathtub, and blood was also found in the bathtub drain. The DNA profile of the blood in the drain was consistent with Goff's DNA profile. A pile of fourteen towels and one washcloth were found hidden under clothes in the master bedroom underneath a pile of dry, dirty clothes. Four of the towels and the washcloth were extremely wet, while the rest were damp. One towel had blood on it. The associate medical examiner testified that the injuries Goff sustained to the back of his head were caused by something with a circular or oval hard surface, which was consistent with one of two hammers found in a box in the apartment kitchen.

All evidence points to Goff being beaten and later dying in the apartment he shared with appellee. Given the position of the body in front of the door, the undisturbed blood spot on the inside doorknob, and the undisturbed windows, it appears the killer did not leave the apartment. Appellee and her three-year-old son were the only people alive in the apartment when Goff's body was found.

Appellee attributes far more importance to the affidavit than it deserves. Although the affidavit was used against her, it cannot be argued successfully that it was the deciding factor in appellee's conviction. As noted above, the affidavit was only one of several pieces of evidence that pointed to appellee's guilt. Appellee cannot prove that but for Davis's alleged errors concerning the affidavit, there is a reasonable probability that appellee would have been acquitted; therefore, the circuit court's decision should be reversed.

Next, appellee claims that Davis was ineffective for failing to call Chris Lindley, appellee's brother, to testify as a witness for the defense. According to appellee, Lindley received an anonymous telephone call in which the caller stated that Lindley would end up like Goff if he told anyone about the arson scheme. Anticipating

such testimony, the prosecution filed a motion in limine at appellee's trial to exclude Lindley's testimony, arguing that it was inadmissible on relevancy and hearsay grounds. Appellee's counsel countered, and the trial court deferred ruling on the motion until the evidence developed at trial. Lindley was subpoenaed and mentioned as a witness at voir dire; however, he did not testify at trial and his proposed testimony was not discussed again.

In her petition, appellee argued that Davis was ineffective for failing to proffer Lindley's testimony for the trial court's or appellate court's consideration or to call him as a witness at trial. The circuit court agreed, holding that counsel was ineffective for failing to call Lindley because there exists a reasonable probability that but for counsel's failure to call Lindley and adequately proffer his testimony, the result of appellee's trial would have been different.

According to Davis, he did investigate Lindley's proposed testimony, and that testimony was the subject of a motion in limine by the prosecution. The trial court actually granted several motions in limine to exclude other evidence of third-party guilt proposed by appellee on the ground that it was irrelevant. Davis made the decision not to call Lindley to testify or proffer his testimony based upon the following: Lindley's testimony was hearsay, and therefore, inadmissable; similar evidence had previously been excluded by the trial court; and Lindley was appellee's brother and the jury could perceive his testimony as biased in favor of the defendant.

We have held:

> The decision of whether or not to call a witness is generally a matter of trial strategy that is outside the purview of Rule 37. *State v. Dillard*, 338 Ark. 571, 998 S.W.2d 750 (1999); *Helton v. State*, 325 Ark. 140, 924 S.W.2d 239 (1996). Trial counsel must use his or her best judgment to determine which witnesses will be beneficial to his client. *Johnson v. State*, 325 Ark. 44, 924 S.W.2d 233 (1996). When assessing an attorney's decision not to call a particular witness, it must be taken into account that the decision is largely a matter of professional judgment that experienced advocates could endlessly debate, and the fact that there was a witness or witnesses who could have offered testimony beneficial to the defense is not in itself proof of counsel's ineffec-

tiveness. *Id.* Nonetheless, such strategic decisions must still be supported by reasonable professional judgment pursuant to the standards set forth in *Strickland.* *State v. Dillard, supra.*

*Nelson v. State*, 344 Ark. 407, 412, 39 S.W.3d 791, 795 (2001). Because counsel's decision was a matter of trial strategy that did not fall beyond the scope of what a competent attorney would recommend; we reverse the circuit court's finding that counsel was ineffective on this point.

Appellee makes no showing of ineffectiveness under the standard set forth in *Strickland.* Counsel's actions were matters of strategy, and appellee suffered no prejudice as a result of his decisions. Accordingly, the circuit court erred in granting appellee's petition.

Reversed.